ZALUTSKY, PINSKI & DiGIACOMO,
LTD., etc., Plaintiff,

v.

Gary KLEINMAN, Defendant.

No. 90 C 3711.

United States District Court,
N.D. Illinois, E.D.

Aug. 29, 1990.

Robert J. Melone, Chicago, Ill., for plaintiff.

James L. Poznak, Siegel and Wille, Oakbrook Terrace, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Illinois professional corporation Zalutsky, Pinski & DiGiacomo, Ltd., formerly known as Zalutsky & Pinsky, Ltd. ("Z & P"), originally sued Gary Kleinman ("Kleinman") in

the Circuit Court of Cook County, seeking an accounting and other relief arising out of Kleinman's claimed breach of their July 15, 1983 law partnership agreement (the "Agreement"). Kleinman removed the action to this District Court, then promptly moved alternatively (1) for dismissal because of an asserted lack of personal jurisdiction over him or (2) for transfer to the United States District Court for the Central District of California under 28 U.S.C. § 1404(a) ("Section 1404(a)"). For the reasons stated in this memorandum opinion and order, the second branch of Kleinman's motion—the transfer—is granted.

### Facts [1]

■ Z & P is a small firm [2] engaged in a high-volume consumer bankruptcy law practice in Chicago. While one of its principals, Irwin Zalutsky ("Zalutsky"), was on vacation in California in December 1982 he met with Los Angeles solo practitioner Kleinman at the request of Kleinman's father-in-law. That meeting stimulated their joint interest in joining forces, as to which Kleinman's January 6, 1983 follow-up letter to Zalutsky (Ex. A to this opinion) is self-explanatory.

Further discussions—a January 1983 meeting in Chicago among Kleinman, Zalutsky and Ronald Pinsky ("Pinsky," then the only other shareholder and director in Z & P), followed by some long-distance negotiations—led to the execution of the Agreement, signed by Zalutsky and Pinsky in Chicago and Kleinman in California. Its most salient features were these: [3]

1. Their relationship was "a general partnership under the laws of the State of California," doing business under the name Zalutsky, Pinsky & Kleinman (¶ 1), with its principal place of business in Hollywood, California (¶ 2).

2. Zalutsky, Pinsky & Kleinman was to have a five-year term (¶ 3). Its sole purpose was the practice of bankruptcy law (¶ 4). Because only Kleinman was a licensed California practitioner, Zalutsky and Pinsky were limited to consulting with Kleinman—not practicing law in California (¶ 5).

3. Any partnership losses were to be shared equally—that is, 50% by Kleinman and 50% by Z & P (¶ 8). Partnership profits were to be shared differently: 60% to Kleinman and 40% to Z & P (id.).

4. All partnership books and records were to be kept at its principal place of business in California (¶ 12). As for the determination of profits and losses (id.):

> The accounting records shall be maintained in accordance with generally accepted bookkeeping practices for the type of business contemplated herein. The books shall be examined by an independent certified public accountant selected by the Partners jointly on a quarterly basis and on an annual basis. Any disputes concerning the profit or loss of the Partnership or the accounts thereof or any elements thereof shall be resolved by such independent certified public accounts [sic] by use of accounting principles consistent with this Agreement.

5. In light of the nature and location of the business (and of course the inherent limitations on Zalutsky's and Pinski's participation), Kleinman was to direct the partnership's day-to-day business affairs (¶ 14). In recognition of the initial know-how that Z & P was bringing to the combination, however, Kleinman was subject to a post-termination restrictive covenant (¶ 19):

**1.** In a number of respects the parties exhibit the typical "Rashomon" pattern—their differing factual versions reflect self-interested advocacy rather than objectivity. Where a controversy exists on the facts affecting in personam jurisdiction, this opinion tends to credit the Z & P position (*Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987)). On the other side of the coin, however, where as here a defendant contests personal jurisdiction, the plaintiffs asserting it have the burden of demonstrating a prima facie case for the existence of jurisdiction under the long arm statute (*Arthur Young & Co. v. Bremer*, 197 Ill.App.3d 30, 35, 143 Ill.Dec. 736, 740, 554 N.E.2d 671, 675 (1st Dist.1990)).

**2.** At this time Z & P has six lawyers and 16 clerical employees.

**3.** All "¶" references are to the Agreement.

Following dissolution of the Partnership, or the voluntary withdrawal of Kleinman, he shall not engage in the practice of representing debtors in Chapter 7 and 13 Bankruptcy Proceedings in Los Angeles County for a period of two (2) years.

6. In seeming forgetfulness of the Agreement's already-referred-to opening paragraph, which said "[t]he Partners hereby form a general partnership under the laws of the State of California," the drafter of the Agreement[4] included a somewhat bizarre choice-of-law provision (¶ 26):

> This Agreement is executed and intended to be performed [sic] in the State of Illinois, and the laws of that state shall govern its interpretation and effect, provided, however, that California law shall govern with regard to Kleinman's conduct as an attorney licenced [sic] to practice law in that state.

So much for the negotiation and execution of the Agreement over seven years ago. Now its term is over (it ended on or about June 30, 1988), and Z & P claims that Kleinman has not furnished the necessary accounting or payment of Z & P's share of partnership income and assets.

### Jurisdiction Over Kleinman

Z & P R.Mem. 6 n.* acknowledges that the facts would not justify possible jurisdiction over Kleinman under the tort branch of the Illinois long-arm statute, Ill.Rev. Stat. ch. 110, ¶ 2–209(a)(2).[5] Instead Z & P relies on the "transaction of any business" clause, Section 2–209(a)(1).

■ At the outset this Court holds that the version of the long-arm statute to be considered is the one that antedates the recent September 1989 amendment that extended the statute's reach to become coextensive with the Due Process Clause. Though Z & P R.Mem. 5–6 contends that the relevant conduct of Kleinman extended past September 30, 1989 so as to bring the new amendment into play (see this Court's opinion in *Bankers Leasing Association, Inc. v. Tompkins, McGuire & Wachenfeld,* 734 F.Supp. 309 (N.D.Ill.1990)), that is singularly unpersuasive. Accordingly this opinion looks to Illinois pre-amendment case law, under which the Illinois Supreme Court several years ago announced that it was not automatically bound to follow slavishly any federal expansion of due process concepts (*Green v. Advance Ross Electronics Corp.,* 86 Ill.2d 431, 436–37, 56 Ill.Dec. 657, 660, 427 N.E.2d 1203, 1206 (1981)). As *Arthur Young,* 197 Ill.App.3d at 35, 143 Ill.Dec. at 740, 554 N.E.2d at 675 puts it:

> Thus, the reach of the long-arm statute may lie within or may touch, but cannot extend outside, the fence marked out by due process requirements as defined in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

*Arthur Young, id.* (citations omitted) frames the analysis in terms that other Illinois cases have made familiar:

> Generally, "transaction of business" within the meaning of the long-arm statute means business in the commercial sense. Thus, plaintiff's claim must be one which lies in the wake of commercial activities by which defendants submitted to the jurisdiction of Illinois courts.

Despite the highly attenuated contacts that link Kleinman to this state, numerous Illinois cases have found that comparable con-

---

**4.** Zalutsky's Aff. ¶ 7 says:
> Following the meeting of the proposed partners in Chicago, I arranged with an Illinois lawyer to draft a written partnership agreement for execution by defendant and plaintiff. A form of agreement was prepared by that lawyer in Chicago, and was circulated to plaintiff and defendant.

Unfortunately the Agreement shows more than one sign of being an amalgam of formbook drafting and individualized drafting, with the provisions not always looking in the same direction.

**5.** All further references to the long-arm statute will simply take the form "Section—." That usage comports with the Illinois General Assembly's use of that word and of the symbol "§" in its enactments, even though the publisher of the Smith–Hurd annotated version of the Illinois statutes has chosen to shift to "¶" instead.

duct does amount to the "transaction of business" here—Kleinman's initial trip for the negotiation of the Agreement plus the document's choice of Illinois law (however odd) would likely suffice to meet the long-arm standard and, a fortiori, to satisfy due process.

But Z & P's stress of that factor really ignores the second part of the statutory requirement: that the submission to jurisdiction is only "as to any cause of action arising from" the transaction of business within Illinois. There are to be sure some cases that automatically equate the entry into a contract that amounts to transaction of business in Illinois with the submission to jurisdiction as to any suit on that contract (see, e.g., *Financial Management Services, Inc. v. Sibilsky and Sibilsky, Inc.*, 130 Ill.App.3d 826, 834, 86 Ill.Dec. 100, 105–07, 474 N.E.2d 1297, 1302–04 (1st Dist.1985)). But that generalized language must be read in the context in which it has been uttered, where the very nature of the claimed breach has demanded no closer analysis than that.

It is no accident that other Illinois cases that have had to look more carefully at the question have concentrated their scrutiny on the now-familiar phrase echoed in *Arthur Young:* "lies in the wake." Figures of speech are of course dangerous if they deflect attention from the statutory test for which they have been coined, and instead begin to stand as surrogates for the statutory language. Judge Posner has perceptively identified the risks of this precise metaphor in *Heil v. Morrison Knudsen Corp.*, 863 F.2d 546, 549 (7th Cir.1988) (citation omitted):

> The "arising from" requirement is liberally construed—all one need be able to say is that the cause of action lies somehow "in the wake" of the Illinois transaction. But this is not to be taken literally. (How could it be? The maritime metaphor is just that—a metaphor.) It is not to be supposed that every time a board of directors meets, it makes waves in whose wakes causes of action float—or, to change the metaphor, plants jurisdictional seeds that sprout years later.

And just so, it is not to be supposed that in this case the parties' January 1983 meeting in Chicago necessarily "ma[de] waves in whose wakes causes of action float—or, to change the metaphor, plant[ed] jurisdictional seeds that sprout[ed] years later" when an alleged breach occurred on *termination* of the partnership relationship.

But if "lies in the wake" is to be taken seriously as a second requirement for personal jurisdiction—as one that reflects the statutory limitation to "causes of action arising from" the transaction of business within Illinois—it poses real difficulties for Z & P here. "Lies in the wake" must be viewed as a concept that shares the attributes of "proximate cause"—it does not simply connote a but-for relationship in the strictly temporal sense. By sheer coincidence, two recent cases have cited to the same authority in that respect in wholly different contexts: *Cooter & Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) as to liability under Fed.R.Civ.P. 11 and *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–84 (7th Cir.1990) as to securities law liability under SEC Rule 10b–5. Each of them referred to Prosser & Keeton on Torts in much the same way, *Bastian* by citation only but *Cooter & Gell*, 110 S.Ct. at 2461 by full quotation of that hornbook's § 41, at 264 (5th ed.1984):

> In a philosophical sense, the consequences of an act go forward to eternity.... As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.

In this case Kleinman's now-complained-of conduct culminated some five years after his "transaction of business" within Illinois (if indeed it was that) by traveling to Chicago to begin the discussions that ultimately led to his entry into the Agreement. If Z & P is right, Kleinman has refused to account properly for the results of his carrying on the practice of law *only* in California—the only state where he is licensed to do that and the sole subject matter of the partnership business—over

the ensuing five years. Kleinman's claimed breach of the Agreement may have had a but-for relationship with its initial execution in the purely literal sense that if the deal had not been made at all, there would have been no agreement to breach. But it did *not* have the kind of causal-nexus relationship stressed in *Cooter & Gell* and *Bastian.* In long-arm terms, the relationship appears to fit what *Heil,* 863 F.2d at 550 spoke of when it said (paraphrased to fit this case):

> There is no vital—no organic—connection between the [1983] meeting and [the end-of-the-relationship conduct by] which, [Z & P] charge[ ], [Kleinman] violated [his] fiduciary obligations to [them].

There is only one trouble with what has been said up to now: It represents *this* Court's view of what seems a sensible reading of the long-arm statute and of the language of thoughtful Illinois cases applying it. But in terms of actual Illinois precedent, this opinion has not drawn directly on such authority. Neither side has pointed to any Illinois case law treating with any truly comparable situations, and this Court's own independent look has not uncovered any.[6]

6. But what has been said here does have some principled support in the Illinois cases. It is no longer the unvarying practice among Illinois courts to apply the "transaction of business" test by a wooden application of contract-formation factors (see, e.g., *Chalek v. Klein,* 193 Ill.App.3d 767, 140 Ill.Dec. 760, 550 N.E.2d 645 (2d Dist. 1990)). That type of approach is wholly consistent with the one suggested in the text. And among the leading "lie in the wake" cases—one regularly cited by later Illinois decisions—*Loggans v. Jewish Community Center,* 113 Ill.App.3d 549, 557, 69 Ill.Dec. 484, 490, 447 N.E.2d 919, 925 (1st Dist.1983) reaches a conclusion much like that suggested here. However, the relationship between the in-state transaction of business and the cause of action later sued upon was even more attenuated in *Loggans* than here.

7. Occasionally things work out otherwise. In 1984 this Court wrote its opinion in *Club Assistance Program, Inc. v. Zukerman,* 594 F.Supp. 341 (N.D.Ill.1984), undertaking the almost hopeless task of reconciling the Illinois decisions that had applied the tort-based branch of the long-arm statute. Then early this year our Court of Appeals in *FMC Corp. v. Varonos,* 892 F.2d 1308, 1312 (7th Cir.1990) cited *Club Assist-*

■ Under *Erie v. Tompkins* principles, what this or any other federal court says about Illinois law cannot control—we are merely sounding boards whose function is to echo state court pronouncements on state law.[7] Consequently this Court cannot, as it would like, say flat-out that in personam jurisdiction might properly be exercised over Kleinman if this action were more closely linked with the *execution* of the Agreement, but it should not be exercised where as here the lawsuit asserts a claim so widely separated both in time and in subject matter from the original negotiation and execution of the Agreement. Maybe this opinion's discussion up to this point will bear fruit for the future, as has been the case with *Club Assistance,* but for the nonce this opinion will assume that Kleinman's motion to dismiss would have to be denied. That assumption, then, requires consideration of Kleinman's alternative Section 1404(a) motion.

### *Section 1404(a) Transfer*

■ Section 1404(a) makes motions to transfer a function of "the convenience of parties and witnesses and . . . the interest of justice." Here the standard is of course federal, and *Erie*-imposed constraints do not apply.

*ance* as "provid[ing] better guidance" as to Illinois law, in terms of the case before the court, than the Illinois Supreme Court decision (*Green*) that had been urged on it by the losing litigant—a flattering use of this Court's opinion, but one really at odds with *Erie.* Even more recently the Court of Appeals (speaking through a different panel) also signed onto *Club Assistance* in *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.,* 906 F.2d 276, 282 (7th Cir.1990). And most surprisingly the Illinois Appellate Court for the First District has now subscribed to the same analysis, actually citing *Club Assistance* as authority for the proposition (*Arthur Young,* 197 Ill.App.3d at 38, 143 Ill.Dec. at 741, 554 N.E.2d at 676). At this point, then, *Erie v. Tompkins* requires that this Court adhere to its own earlier exposition of Illinois law! Ironically, that is precisely the same result that would have obtained under Justice Story's opinion in *Swift v. Tyson,* 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), which *Erie* went to such lengths to overrule after almost a century. See this Court's article, *Are Federal Courts Necessary?,* 18 Loy. U.Chi.L.J. 1, 8–13 (1986).

Z & P's choice of forum deserves little weight here. Section 1404(a) gives that factor substantially less force than did the forum non conveniens doctrine (*Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955), reconfirmed in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253, 102 S.Ct. 252, 264, 70 L.Ed.2d 419 (1981)). And it has already been pointed out that the Illinois contacts with the *cause of action* itself are minimal. This case therefore approaches, though it may not match, the still-valid proposition of *Chicago, Rock Island & Pacific R.R. Co. v. Igoe*, 220 F.2d 299, 304 (7th Cir.1955), under which a cause of action that has no connection with the forum creates a minimal preference if any for the plaintiff's choice of forum. But even if Z & P *is* given some preference because of its decision to sue here, it must still lose under any objective evaluation of the three Section 1404(a) factors.

In terms of "convenience of the parties," the case has some of the elements of the standoff status that often results from the unwillingness of either side to litigate on the other's turf. On balance, however, Kleinman plainly has the better of it.

Z & P R.Mem. 12 says:

> If this case were to be tried in California, plaintiff would require both of its managers, Zalutsky and Pinsky to be witnesses and to work in California with California counsel, and the business of plaintiff would suffer in their absence.

But there are two overriding responses to that. First, it appears that Kleinman's required absence for forced travel to an Illinois forum would pose greater inconvenience for him than the opposite situation would for Z & P, given the difference in size of their respective law office operations. But even more significantly, any required testimony of Zalutsky and Pinsky will by definition be much less time consuming and less critical to the facts at issue than the testimony of the man who ran the shop in California, Kleinman. Thus

the very factor emphasized by Z & P for keeping the case here would not simply avoid substituting one party's inconvenience for the other's (an impermissible motive for Section 1404(a) transfer, see 15 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3848, at 385–86 & n. 20 (2d ed. 1986)).

Relatedly, the corollary Z & P argument that it will be more expensive to try the case elsewhere than in Illinois cannot be controlling. It too finds its mirror image on Kleinman's side of the issue—and if a plaintiff's added expense alone were to be determinative, *no* Section 1404(a) motion could ever be granted.

As for the convenience of witnesses (usually the most significant of the three statutory factors), Z & P has not identified a single person other than themselves who would be inconvenienced by transfer of the case to California. By contrast, it seeks to downplay the obviously important testimony of the accountants (whose determination of disputed issues is made controlling by Agreement ¶ 12 itself, and whose testimony would be essential to the calculation even apart from that factor). Those accountants are not amenable to process here, but they are in California. And to the extent that questions may arise as to any particular client's matters that enter into partnership income and expenses (a presently-unknown factor), that testimony *must* also perforce be California-based and not Illinois-connected at all. Consequently the convenience of the witnesses is heavily weighted toward transfer.

■ Finally, the congeries of factors lumped under "interest of justice"[8]—usually drawn from the forum non conveniens considerations spelled out in *Gulf Oil v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)—also points to transfer. Those factors may be ticked off briefly:

1. the relative ease of access to sources of proof;

---

8. In *Letter–Rite, Inc. v. Computer Talk, Inc.*, 605 F.Supp. 717, 721 (N.D.Ill.1985) this Court de-

scribed those factors as "a grab-bag of sorts."

2. the amenability of unwilling witnesses to service of process;

3. the cost of attendance at trial of willing witnesses;

4. the relation of the community in which the courts and jurors are required to serve to the occurrence at issue in the litigation;

5. the accessibility of premises involved in the litigation;

6. the relative congestion of the court dockets and prospects for earlier trial; and

7. in a diversity case, the relative familiarity of the courts with the state law supplying the applicable rules of decision.

As for the ease of access to sources of proof, that is entirely one-sided. *Everything* in connection with the requested accounting is in California—both in terms of documents and witnesses. Nothing other than any testimony by Zalutsky and Pinsky has been identified as having any Illinois roots.

And the same is true as to the amenability of unwilling witnesses to service of process. That subject has already been fully covered and need not be repeated.

As for the cost of attendance at trial of willing witnesses, that too has been dealt with earlier in this opinion. It appears to be pretty much an even balance, but even if it were to be viewed as tipping in favor of Z & P it could not overcome the many other factors pointing in the opposite direction.

As for the comparative interests of the two states—their respective relationships to the litigation—any objective analysis must treat California as prevailing on this

count as well. Each state has an understandable interest in the welfare of its own residents, and that is equally balanced between them so far as the parties are concerned. But the entire five-year practice of law that is the subject matter of this action took place in California, and *that* element is not balanced by any corresponding Illinois interest.

No physical premises are involved in the litigation, as would be the case in (say) a personal injury action. That factor, then, simply drops out of the equation.

Next, a comparison of the court congestion factors also favors transfer despite Z & P's arguments to the contrary. In terms of their judicial complements, the districts are almost identical in size (21 authorized judges here and 22 in the Central District of California), as are the numbers of case filings (10,776 here as against 11,091 there [9]). Because of the difference in the number of judges, the per-judge filings are a bit higher here, though not significantly (513 here as against 504 there). But to anyone who understands the realities behind the statistics, the most meaningful figures in terms of court congestion are not the raw numbers of pending cases at year-end (which would tend to favor the California district) but these:

1. *Weighted* filings per judge (a figure that takes into account the comparative complexity of cases as well as their sheer volume) are nearly 15% higher here than there (603 as against 535).[10]

2. Median time from the date that a civil case is at issue until its trial date is 25% longer here than there (15 months as against 12 months).[11]

---

**9.** All figures here are for the last full fiscal year for which figures are available, that ended June 30, 1989.

**10.** Indeed, this past year is the first in this Court's recollection that the Northern District of Illinois did not rank 1, 2 or 3 in the entire country in this category—it stands seventh. Incidentally, if the weighted-filings numbers had been calculated in terms of the judges actually sitting, rather than the authorized complement, the disparity would have been greater still (there was a partial-year vacancy on this District Court).

**11.** Z & P mistakenly compares the median times from filing to disposition dates, which would favor this district. But that is a much less significant comparison for a number of reasons—for example, this district has an extraordinarily large number of mortgage foreclosure cases involving diversity of citizenship. Those cases most frequently go by default, creating a misleadingly low overall figure for median times of disposition (incidentally, it is obvious that this district's heavier weighted filings *despite* the presence of those minimal-effort cases would mean an even greater disparity if those cases were eliminated from consideration).

3. One significant measure of the complexity of caseload and related calendar congestion is the percentage of cases over three years old. On that score, the number here is almost 10% as against 6% for the California district.

Finally, it is true that the Agreement sets up Illinois law as a reference point for the rules of decision, and that this Court would certainly be more familiar with that source of law than a California District Court. But the Agreement does not appear at all ambiguous in its requirements so as to call on this Court's specialized knowledge as to any arcane mysteries of local law (as distinct from general partnership law). And the same seems true of the issues raised by Z & P's claim.

In summary, the entire balancing process and the miscellaneous factors that make up the "ends of justice" heavily favor transfer of the case, just as did the other two factors. This action should and will be transferred.

### Conclusion

■ There are highly persuasive reasons for granting Kleinman's motion to dismiss for lack of personal jurisdiction. But because that would be wasteful—it would merely force Z & P to file a new action in California, with consequent wasted activity and expense on both sides—and because transfer under Section 1404(a) is appropriate in any event, the motion to dismiss will be denied and the Section 1404(a) transfer will be granted. This action is ordered transferred to the United States District Court for the Central District of California, and the Clerk of this Court is ordered to effect the transfer forthwith (see this District Court's General Rule 30(a)).

EXHIBIT A

LAW OFFICES OF
**GARY KLEINMAN**

☐ 1888 CENTURY PARK EAST, 6TH FLOOR
LOS ANGELES, CALIFORNIA 90067
(213) 556-2335

☐ 6728 SEVILLE AVENUE
HUNTINGTON PARK, CALIFORNIA 90255
(213) 589.5989

January 6, 1983

Irwin L. Zalutsky
ZALUTUSKY and PINSKI Ltd.
20 North Clark Street Ste. 600
Chicago, Ill. 60602

Dear Sonny:

Thank-you very much for taking time from your vacation to speak with me.

I received your brochure and am very impressed with your system. I am still waiting for the other information you were going to send to me.

During our first telephone conversation, you stated that your firm is going 'national'. I am <u>very</u> interested in pursuing this field of law and believe that we can arrange a mutually beneficial agreement whereby you can expand in California, and I can increase my caseload and income.

I am available to meet with you and your partner in Chicago or anywhere else to discuss all available options and alternatives.

After I review your second packet of information, I will call you in order to discuss these ideas.

Once again, thank-you for your interest. I look foward to meeting with you in the near future.

Very truly yours,

GARY KLEINMAN

GK/vrb